FILED
DEC 1 7 2014
Clerk, U.S. District and
Bankruptcy Courts

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Noah K Slackman, being first duly sworn, state the following:

### INTRODUCTION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to obtain a palm print from Ted Duckett ("DUCKETT").

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been employed as a Special Agent with ATF since 2005. During this time, I have conducted and participated in numerous investigations concerning the illegal possession of firearms, federal controlled substances, and the commission of violent crimes, to include armed robberies of cocaine, which are also known as home invasion robbery investigations, or "stash house" robbery investigations.

3. During my employment as an ATF Special Agent, I have received specialized training regarding, and have personally participated in, various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants and other individuals who have knowledge concerning violations of federal firearms laws; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace devices; (g) the court-authorized interception of both wire and electronic communications (i.e., Title III wiretaps); and (h) the handling and maintenance of evidence.

1

Case: 1:14-mj-00723
Assigned To : Magistrate Judge John M. Facciola
Assign. Date : 12/17/2014
Description: Search and Seizure Warrant

4       This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter

## PROBABLE CAUSE

5       Your Affiant respectfully submits that probable cause exists to believe that evidence of violations of (a) conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U S C § 846, (b) conspiracy to obstruct, delay, or affect commerce by robbery, in violation of 18 U S C § 1951(a), (c) possession of firearms in furtherance of a crime of violence or drug trafficking crime, in violation of 18 U S C § 924(c), and (d) conspiracy to possess firearms in furtherance of a crime of violence or drug trafficking crime, in violation of 18 U S C § 924(o), will be obtained by taking a palm print sample from DUCKETT

6       To the extent that consensually recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversations that were recorded   In addition, the summaries do not include references to all statements made by the speakers on the topics that are described   All quotations from recorded conversations are based upon preliminary transcriptions of those conversations and/or from your Affiant having personally listened to the recordings   In addition, the participants in many of these communications used slang terms and code words   Those code words and slang terms, as well as communications in general, are analyzed for their meaning in this Affidavit based upon information from (a) CS-1, (b) my training, experience and knowledge of this investigation, (c) other law enforcement officers' training, experience and knowledge of this investigation, and (d) other evidence gathered during the course of the investigation, such as physical surveillance


7   Between in or about September 2013 and on or about October 29, 2013, DUCKETT conspired with Maurice Foster ("Foster"), and Donnell Williamson ("Williamson") to rob certain drug dealers operating in Maryland, and conspired to possess with the intent to distribute five kilograms or more of cocaine, a Schedule II controlled substance

8   On or about October 10, 2013, at a location in Maryland, DUCKETT met an undercover agent ("UC") working for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") The meeting was recorded using a hidden audio and video device During this meeting, the UC explained how he would be transporting 2 to 3 kilograms of cocaine from a narcotics stash house, which would contain approximately 12 to 15 kilograms of cocaine The UC further explained that he (a disgruntled drug courier) planned to rob the cocaine stash house, which was protected by armed guards, and would split the stolen cocaine (12 to 15 kilograms) with whoever helped him commit the robbery DUCKETT agreed to commit the robbery and discussed how he and his crew planned to execute the robbery and obtain the cocaine DUCKETT assured the UC that he had the equipment necessary to rob a stash house protected by armed guards DUCKETT also told the UC that his robbery crew consisted of two other individuals, whom DUCKETT would bring to future meetings with the UC

9   On or about October 11, 2013, the UC and DUCKETT arranged to meet again to discuss the details of the robbery That same day, Foster and DUCKETT met the UC at a restaurant in Maryland This meeting was recorded using a hidden audio and video device During this meeting, the UC repeated to Foster and DUCKETT that the UC was a disgruntled drug courier who planned to rob a stash house containing 12 to 15

kilograms of cocaine. DUCKETT assured the UC that DUCKETT's crew knew how to commit these types of robberies. DUCKETT also told the UC that if the UC had no connection to the armed guards protecting the stash house, the robbery could be done with force. Foster asked the UC several questions about the details of the robbery, including how many individuals would be located inside the stash house on the day of the robbery and whether the armed guards would fire their guns as Foster and the robbery crew entered the stash house to commit the robbery. The UC advised Foster that, upon completion of the robbery, the 12 to 15 kilograms of cocaine in the stash house would be split evenly, with the UC receiving half and the robbery crew receiving the other half. DUCKETT again confirmed that the robbery could be carried out, and asked the UC about the best way to enter the stash house.

10. On or about October 23, 2013, the UC and DUCKETT arranged to meet again to discuss the details of the planned robbery. That same day, DUCKETT and Williamson met the UC at a location in Maryland. This meeting was recorded using a hidden audio and video device. During this meeting, the UC repeated to DUCKETT and Williamson that the UC was a disgruntled drug courier who planned to rob a stash house containing 12 to 15 kilograms of cocaine. During this meeting, Williamson advised the UC that the robbery crew would execute the robbery inside the stash house. During the conversation, Williamson confirmed the particulars of the robbery by repeating the quantity of cocaine that would be located in the stash house and that two guards would be protecting the drugs. Williamson also asked the UC where on his person the guard protecting the house kept his weapon, and Williamson assured the UC that the robbery crew would remove the firearm from the armed guard stationed at the entrance of the

4

stash house. DUCKETT also confirmed that Foster was still planning to assist him and Williamson in committing the robbery.

11. On or about October 29, 2013, the UC and DUCKETT spoke on the telephone and DUCKETT confirmed that they were ready to commit the robbery. After this conversation, DUCKETT, Foster, and Williamson drove together in a vehicle and met the UC at location in Laurel, Maryland. DUCKETT asked the UC about the location of the rental car, which they were going to use to commit the robbery, and the UC confirmed it was at a nearby location. The UC asked DUCKETT, Foster, and Williamson if they wanted to put their straps, which is code for firearms, in the UC's vehicle before driving to the rental car location. DUCKETT responded in the affirmative and asked the UC to pull his vehicle over. At this point, Williamson removed a duffle bag from the vehicle in which DUCKETT and Foster were located, and Williamson placed this duffle bag in the trunk of the UC's vehicle. Williamson, DUCKETT, and Foster then followed the UC in their own vehicle to another location in Maryland, where the conspirators believed they would pick up the rental car and receive the location of the cocaine stash house. Once they arrived at the second location, the UC told them that there would be 14 in the stash house—meaning 14 kilograms of cocaine—and that the UC and the three conspirators would split it evenly. In response to this comment, DUCKETT asked the UC how he knew there were 14 in the stash house, and the UC responded that the guy inside the stash house had just told the UC this information. Shortly after this point, the law enforcement arrest team approached and placed Foster, DUCKETT, and Williamson under arrest.

12   A search incident to arrest resulted in the recovery of several firearms Inside the duffle bag that Williamson had placed in the UC's vehicle, officers recovered three firearms and ammunition (1) a Beretta pistol containing rounds of ammunition, (2) an Intratec pistol containing rounds of ammunition, and (3) a Smith & Wesson pistol containing rounds of ammunition

13   On December 18, 2013, a federal grand jury for the District of Maryland returned a superseding indictment charging DUCKETT, Williamson, and Foster with (a) conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U S C § 846, (b) conspiracy to obstruct, delay, or affect commerce by robbery, in violation of 18 U S C § 1951(a), (c) possession of firearms in furtherance of a crime of violence or drug trafficking crime, in violation of 18 U S C § 924(c) and (d) conspiracy to possess firearms in furtherance of a crime of violence or drug trafficking offense, in violation of 18 U S C § 924(o)

14   In order to analyze prints lifted from the crime scene, the lab needs a palm print comparison from the defendants, including DUCKETT  When and if the court grants authorization to obtain a palm print from DUCKETT, law enforcement agents will then submit that palm print to the lab for comparison

## CONCLUSION

15. Based upon the given facts, your affiant submits that there is probable cause to believe that obtaining a palm print from DUCKETT will assist in the Government's investigation. Therefore, I respectfully request that a search warrant be issued permitting law enforcement agents to obtain a palm print from DUCKETT.

I declare under penalty of perjury that the foregoing is true and correct.

x _____
Special Agent Noah Slackman
Bureau of Alcohol Tobacco and
Firearms and Explosives

Sworn and subscribed before me this    DEC 17 2014    day of December 2014

_____
JOHN M. FACCIOLA
United States Magistrate Judge